Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SIGNET MEDIA, INC., | |
| **Plaintiff,** | Civil Action No. 24-4441 (ES) (JBC) |
| v. | **OPINION** |
| LG ELECRONICS, U.S.A., INC. and LG ELECTRONICS MOBILECOMM U.S.A., INC. | |
| **Defendants.** | |

**SALAS, DISTRICT JUDGE**

Before the Court is Defendants' LG Electronics, U.S.A., Inc. ("LGEUS") and LG Electronics MobileComm U.S.A., Inc. ("LGEMM") (collectively, "Defendants") motion to dismiss plaintiff Signet Media, Inc.'s ("Plaintiff") Amended Complaint (D.E. No. 24 ("Amended Complaint" or "Am. Compl.")). (D.E. No. 30 ("Motion" or "Mot."); *see also* D.E. No. 30-1 ("Moving Brief" or "Mov. Br.")). Plaintiff filed an opposition (D.E. No. 34 ("Opp. Br.")), and Defendants filed a reply (D.E. No. 35 ("Reply Br.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, Defendants' Motion is **GRANTED**, and Plaintiff's Amended Complaint is **DISMISSED** *without prejudice.*

## I.    BACKGROUND

### A.    Factual Allegations

***Eyesync Development.*** Plaintiff "is the developer of a digital engagement platform that facilitates communications and marketing across various divisions and departments to create a

single point of contact for efficiency and reporting within a particular organization." (Am. Compl. ¶ 1). In 2010, Plaintiff began work on Eyesync—a "unique" and "server-based" technology which "would allow different video content to be displayed simultaneously on multiple screens and . . . allow audio synchronicity with any desired video content from a mobile device connected with the server system." (*Id*. ¶ 2). The technology "can play any video file using media player software, and the audio rendered by the media player application on the server is captured using the Eyesync server application." (*Id*. ¶ 15). Plaintiff claims that its engineers invented Eyesync as a "novel solution to addressing latency problems in the network which involved the development of detailed protocols which allowed for continual synchronization of audio with video displays that successfully managed lip sync over time." (*Id*. ¶ 18). Furthermore, "[o]ther aspects of Eyesync system technology developed by Signet engineers included complex compression algorithms, auto discovery, customized user interfaces, dynamic interface skinning and location-based services for analytics." (*Id*.). The Eyesync technology was completed and became available in 2015. (*Id*. ¶ 2). Plaintiff alleges that "[t]he development of the Eyesync system was arduous and difficult," and the technology was "only achieved through many man hours of engineering design and implementation work over a six (6) year period between 2010 and 2015." (*Id*. ¶ 17).

Plaintiff alleges that, during this entire time period, "Signet's trade secret information was not known outside of Signet's business." (*Id*. ¶ 19). Plaintiff "only had five employees with access to [its] trade secret information," and Plaintiff kept its technology "in a laboratory . . . under access control." (*Id*. ¶ 20). Plaintiff further subjected its employees "to employee agreements addressing the protection of Signet's proprietary information," (*id*. ¶ 21), and "retained an independent contractor under an agreement addressing the protection of Signet's proprietary and confidential information," (*id*. ¶ 22). As for prospective customers, Plaintiff alleges that it "placed [them] on

2

notice of Signet's proprietary and confidential information." (*Id*. ¶ 23). Accordingly, Plaintiff maintains that "it would have been exceptionally difficult for a third party to independently duplicate Signet's trade secret information and implement that information in a commercially viable product." (*Id*. ¶ 24).

*Relationship Between Plaintiff and Defendants.* Plaintiff launched the Eyesync system at an exposition in Las Vegas in March 2015. (*Id*. ¶ 25). Shortly thereafter, "[o]n or about June 26, 2015, LG representatives reached out to Signet and asked for a demonstration of the Eyesync system."[1] (*Id*. ¶ 26).[2] On August 26, 2015, Plaintiff performed a demonstration for the "LG representatives." (*Id*.). Plaintiff alleges that "LG informed Signet that the company wanted to learn about the technology underlying the Eyesync system and proposed that the parties enter into a non-disclosure agreement to facilitate those discussions." (*Id*. ¶ 27). Accordingly, "LG" prepared a written "Mutual Non-Disclosure Agreement" ("NDA"), effective September 3, 2015. (*Id*. ¶ 28). Plaintiff and Defendant LGEMM signed the NDA. (*Id*.).

---

[1]    Plaintiff does not identify the "LG Representatives" who requested this demonstration, or otherwise indicate whether the individuals represented Defendant LGEUS or Defendant LGEMM. (*See generally* Am. Compl.). Similarly, Plaintiff often refers to "LG" in both its Amended Complaint and its Opposition Brief without differentiating whether it refers to either, both, or neither of the Defendants. (*See generally* Am. Compl.; Opp. Br.). Because the Court finds that Plaintiff did not plead a trade secret with sufficient particularity, it does not attempt to distinguish the alleged conduct of the Defendants with respect to Counts I, II, and V. The same is true for Count VI, which the Court also finds Plaintiff has failed to adequately allege. The Court *does* consider Plaintiff's failure to clearly distinguish between the two Defendants as relevant to Counts III and IV, for reasons discussed *infra*. To the extent Plaintiff files an amended complaint, Plaintiff shall clearly delineate the alleged conduct of each named defendant (i.e., LGEUS or LGEMM) to avoid group pleading.

[2]    Plaintiff attached a copy of the NDA to its original complaint and labeled it "Exhibit A." (*See* D.E. No. 1 ¶ 19; *see also* D.E. No. 1-1). In Plaintiff's Amended Complaint, although it refers to the NDA and says that it has attached the document again as "Exhibit A," Plaintiff neglected to re-file the document. However, because Plaintiff clearly intended to incorporate the document into its Amended Complaint and previously provided the Court with the exhibit, the Court will consider the document attached to the original complaint (*see* D.E. No. 1-1 ("Exhibit A" or "Ex. A.")). Further, the Court may properly consider the NDA as "undisputed documents referenced in the complaint and central to the plaintiff's claim" without converting Defendants' Motion to one for summary judgment. *See Rogan v. Giant Eagle, Inc.*, 113 F. Supp. 2d 777, 782 (W.D. Pa. 2000), *aff'd*, 276 F.3d 579 (3d Cir. 2001).

Plaintiff claims that, "[b]etween September 2015 and November 2015 LG [and] Signet conducted several meetings and exchanged communications concerning the Eyesync technology." (*Id*. ¶ 29). At Defendants' request, "Signet disclosed to LG representatives[3] confidential and proprietary information pertaining to Signet's Eyesync audio synchronization technology." (*Id*.). Plaintiff asserts that it disclosed trade secrets, including the "technical details on how to implement and achieve" certain "novel and customized technical functionalities" specific to Eyesync such as:

(a) Customized UDP protocols for network optimization to eliminate packet collision and latency;

(b) Non-standard port configurations and custom application messaging used in a unique network methodology for delivery at various platform levels;

(c) Network sampling techniques integrated in a server to manage packets and efficiently deliver packets across the network to overcome latency problems;

(d) A unique approach involving the separation of audio components from visual components in a multimedia channel and packetizing the audio components for transmission such that a mobile user of a wireless device may receive the packets and play the audio components in synchronization with the visual components;

(e) Proprietary algorithms for packetization management and optimization of network and application efficiency;

(f) Dynamic user interface skinning through the use of metadata collection throughout the network;

(g) Hardware level capture and kernel level extraction of audio components for efficient audio management and encoding optimization;

---

3    Plaintiff identifies these "LG Representatives" to whom it disclosed "confidential and proprietary information" as "Raul Quino (then head of LG Innovation Ventures) and Dahyun (Audrey) Oh (Manager, LG Electronics, in South Korea)"—"among others." (Am. Compl. ¶ 29).

(h) Customized audio driver development, including bit rate sampling techniques, for the extraction and configuration of multiple content streams at the server;

(i) Configuration and dynamic management of a server system to scale multiple audio streams with tagging, latency, and scaling management: receive and distribute multiple audio streams;

(j) Encoding techniques, including customized bit rates for multicast distribution; and

(k) API tagging of content and content management, including advertising, for delivery to specific displays.

(*Id*. ¶ 31). After Signet made "these disclosures, LG representatives communicated to Signet that Signet was one of six candidates competing for a novel innovative product or development and that Signet had won that contest, and LG was interested in moving the relationship forward with the intention to license Signet's technology." (*Id*. ¶ 32).

At that point, "LG representatives invited Signet representatives to join LG at [an] upcoming Consumer Electronics Show" so that they could "provide a demonstration of Signet's Eyesync system at the LG booth." (*Id*. ¶ 33). However, LG later "informed Signet that LG was short of time and would not be able to accommodate Signet's participation at the show." (*Id*. ¶ 34). Sometime after LG revoked Signet's invitation to participate in the show, "communications between Signet and LG trailed off." (*Id*. ¶ 35). Although "LG did not inform Signet that it no longer wished to move forward with a licensing agreement," Signet eventually "concluded that LG had lost interest in the Eyesync system and its technology." (*Id*.). Notwithstanding "occasional inquiries" from Signet, LG ceased all further discussions between the parties. (*Id.* ¶ 36).

***Defendants' "Pro:Centric Catena" Technology***. Plaintiff alleges that in or around May 2021, "LG commenced marketing a new display management system named Pro:Centric Catena." (*Id.* ¶ 37). LG claims that Pro:Centric Catena allowed for "direct audio streaming to customers'

devices aligned with multiple video displays in places such as sports bars, hotel lounges, fitness centers, sports books in casinos and museums." (*Id.*). Plaintiff did not know about Pro:Centric Catena before May 2021 and "was surprised to learn that LG had commenced marketing what was apparently a display management system very similar to Signet's Eyesync system." (*Id.* ¶ 38). Like Eyesync, LG represented that its Pro:Centric Catena system "would allow customers to select from available television broadcasting and listen to the audio through their own mobile devices." (*Id.* ¶ 38). Therefore, Plaintiff ultimately alleges that "LG used Signet's trade secrets in developing its Pro:Centric Catena system," because Defendants' new system "incorporates the same Eyesync trade secret technology and functionalities disclosed to LG under the NDA in 2015," including "the same unique audio synchronization modality that was of particular importance to LG during discussions with and presentations from Signet." (*Id.* at 39). Plaintiff further maintains that the "Pro:Centric Catena platform replicates the functionality and technology of Signet's Eyesync system and appears to use and incorporate the confidential and proprietary information and trade secrets disclosed by Signet LG under the NDA years earlier." (*Id.* ¶ 41).

## B.    Procedural History

On April 1, 2024, Plaintiff initiated this trade secrets action by filing the Complaint against Defendants and asserted six causes of action. (D.E. No. 1 ¶¶ 32–82). On June 10, 2024, Defendants filed a joint motion to dismiss Plaintiff's complaint. (D.E. No. 18). On July 1, 2024, Plaintiff filed an Amended Complaint raising the same six causes of action, specifically: (i) alleged "misappropriation of trade secrets under the Defend Trade Secrets Act [("DTSA")], 18 U.S.C. § 1836, *et seq*." (Count I); (ii) alleged "misappropriation of trade secrets under the New Jersey Trade Secrets Act [("NJTSA")], N.J. Rev. Stat. § 56:15-1, *et seq*." (Count II); (iii) "breach of a written non-disclosure agreement" (Count III); (iv) "breach of the implied covenant of good faith and fair

dealing" (Count IV); (v) "common law misappropriation" (Count V); and (vi) "unjust enrichment"

(Count VI).  (Am. Compl. ¶ 8).[4]  Thereafter, Defendants filed a joint motion to dismiss Plaintiff's

First Amended Complaint.  (*See generally* Mot.; Mov. Br.).  The motion is fully briefed.  (*See* Opp.

Br.; Reply Br.).

## II.    LEGAL STANDARD

In assessing whether a complaint states a cause of action sufficient to survive dismissal

under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all

reasonable inferences in favor of the plaintiff."  *City of Cambridge Ret. Sys. v. Altisource Asset

Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "[T]hreadbare recitals of the elements of a cause

of action, legal conclusions, and conclusory statements" are all disregarded.  *Id*. at 878–79 (quoting

*James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The "complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"

and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Zuber v.

Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d

121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

While the Court generally "may not consider matters extraneous to the pleadings" when

deciding a Rule 12(b)(6) motion, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426

(3d Cir. 1997) (citation omitted), an exception to this general rule provides that the Court may also

consider "exhibits attached to the complaint, matters of public record, as well as undisputedly

authentic documents if the complainant's claims are based upon these documents."  *Mayer v.

---

[4]    In light of the Amended Complaint, the Court administratively terminated Defendants' first motion to dismiss as moot.  (D.E No. 25).

7

*Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (noting that pursuant to Rule 12(b)(6) the Court "may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case'" (alteration in original) (first citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 559 (3d Cir. 2002); and then quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004))).

## III.    DISCUSSION

The Court considers in turn Plaintiff's claims of trade secret misappropriation under the DTSA, NJTSA, and New Jersey common law (Counts I, II, & V), Plaintiff's claims of breach of contract (Count III) and breach of the implied covenant of good faith and fair dealing (Count IV), and Plaintiff's claim of unjust enrichment (Count VI).  For the reasons set forth below, the Court finds that each Count in Plaintiff's Amended Complaint must be dismissed failure to state a claim.

### A.    Plaintiff's Claims for Trade Secret Misappropriation under the DTSA, NJTSA, and Common Law Misappropriation (Counts I, II, & V)

"Because the statutory schemes of the NJTSA and DTSA are 'substantially similar as a whole,' courts often combine the analyses of the two schemes."  *OWAL, Inc. v. Caregility Corp.*, No. 21-13407, 2022 WL 890182, at *6 (D.N.J. Mar. 25, 2022) (quoting *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 n.11 (3d Cir. 2021)).

The DTSA "provides a civil cause of action to '[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'"  *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 354 (D.N.J. 2019) (quoting 18 U.S.C. § 1836(b)(1)).  Under the NJTSA, a party must establish, "(1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the

employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Austar Int'l Ltd.*, 425 F. Supp. 3d at 355 (citing *Merckle GmbH v. Johnson & Johnson*, 961 F. Supp. 721, 730 (D.N.J. 1997)).  The NJTSA defines "trade secret" in a near-identical fashion as the DTSA.[5]

Thus, "the analysis under DTSA folds into that of NJTSA." *Scherer Design Grp., LLC v. Schwartz*, No. 18-3540, 2018 WL 3613421, at *4 (D.N.J. July 26, 2018), *aff'd sub nom. Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147 (3d Cir. 2019).  Indeed, the Third Circuit has evaluated DTSA and NJTSA claims under the same standard:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret.

---

[5]    The NJTSA defines a "trade secret" as "information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  N.J. Stat. Ann. § 56:15-2.  The DTSA defines the same as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C.A. § 1839(3).

*Oakwood Lab'ys LLC*, 999 F.3d at 905 n.11 (citation modified); *see also Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-1677, 2023 WL 7403539, at *5 (D.N.J. Nov. 9, 2023) (considering DTSA and NJTSA claims together under the same analytical framework).[6]

With respect to Count V—alleging a claim for misappropriation of confidential information under New Jersey common law—New Jersey common law similarly requires, *inter alia*, that a trade secret was "acquired by the competitor with knowledge of the [employee's] breach of confidence, and [ ] used by the competitor to the detriment of the plaintiff." *Nasdaq Inc. v. Miami Int'l Holdings, Inc.*, No. 17-6664, 2023 WL 4740753, at *9 (D.N.J. July 25, 2023) (citing *Rohm & Haas Co. v. ADCO Chem. Co.*, 689 F.2d 424, 429–430 (3d Cir. 1982)). Courts in this District therefore evaluate all three types of trade secrets claims (as in, those brought under the DTSA, NJTSA, and New Jersey common law) together, under the same standard. *See, e.g.*, *Nasdaq Inc.*, 2023 WL 4740753, at *9 (considering plaintiff's DTSA, NJTSA, and New Jersey common law trade secret misappropriation claims "together"). The Court accordingly considers Counts I, II, and V together below.

As an initial matter, Defendants argue that this Court should dismiss Plaintiff's federal and state misappropriation claims because Plaintiff "has not identified any alleged trade secret with sufficient particularity." (Mov. Br. at 21). Defendants contend that Plaintiff "has only alleged general categories of information, without explaining what within each category constitutes a

---

[6] The parties appear to dispute whether this Court should apply the six-factor "*Hammock* test" to determine whether Plaintiff has sufficiently pled the existence of a trade secret under the DTSA or the NJTSA. *See Hammock by Hammock v. Hoffmann-LaRoche, Inc.*, 662 A.2d 546 (1995); (*compare* Mov. Br. at 8 (arguing that the Court "must consider the following six *Hammock* factors to determine whether information exists as a 'trade secret'"), *with* Opp. Br. at 5 (rebutting that "[t]he *Hammock* decision predates the DTSA by over 10 years and this Court should follow the Third Circuit's decision in *Oakwood Labs*")). This Court, like the Third Circuit, declines to decide this issue because Plaintiff has failed to plead the existence of trade secrets with sufficient particularity as defined under the NJTSA and DTSA. *See Voorhees v. Tolia*, No. 23-1115, 2023 WL 4636738, at *2 n.7 (3d Cir. July 20, 2023). To the extent Plaintiff seeks to amend and replead its allegations that Defendants misappropriated its trade secrets and the Defendants elect to renew their motion to dismiss, the parties shall brief whether this Court should apply the *Hammock* test.

"trade secret" that Signet seeks to protect." (*Id*. at 22). Defendants point, for instance, to the second trade secret listed in Plaintiff's Amended Complaint: "[n]on-standard port configurations and custom application messaging used in a unique network methodology for delivery at various platform levels." (*Id*. (quoting Am. Compl. ¶ 31(b))). Defendants argue that Plaintiff's articulation of this alleged trade secret "does not indicate what '[n]on-standard port configurations and custom application messaging' it seeks protection for – when port configurations and messaging applications are commonplace aspects of computer networking." (*Id*. at 22 (quoting Am. Compl. ¶ 31(b))). Defendants maintain Plaintiff "defined [each alleged trade secret] in this fashion," (*id*. at 23), such that each of the trade secrets Plaintiff alleged in its Amended Complaint "[are] commonplace or necessary within the computer networking space, in which a myriad array of solutions are possible," (*id*. at 24). Moreover, "Plaintiff does not cite any document, source, or other information that would assist Defendants in identifying the alleged trade secrets." (*Id*. at 24).

In opposition, Plaintiff argues that its Amended Complaint "specifies the particular functionalities and components of the Eyesync system, including proprietary algorithms for packet transmission, encoding techniques with customized bit rates for multicast distribution and a number of specific audio synchronization techniques that solve troublesome latency problems and provide an efficient delivery of audio and video packets in a synchronized manner." (Opp. Br. at 11). Thus, Plaintiff asserts, its alleged trade secrets are pled with sufficient particularity. (*See id*. at 12). Defendants argue in reply that "[m]erely inserting the word 'unique' or 'customized' before a generic description of commonplace technical concepts is not sufficient to transform these concepts into trade secrets." (Reply Br. at 3).

To establish a claim for misappropriation of trade secrets, a plaintiff first must "sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the

information is indeed protectable as such." *Oakwood Lab'ys LLC*, 999 F.3d at 905 (citing 18 U.S.C. §§ 1836(b), 1839(3)).  Then, a court weighs (i) "whether the owner of the information has taken reasonable measures to keep it secret[;]" and (ii) "whether the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Oakwood Lab'ys LLC*, 999 F.3d at 905 (quoting 18 U.S.C.A. § 1839) (citation modified); *see also Voorhees*, 2023 WL 4636738, at *2 (citing N.J. Stat. Ann. § 56:15-2).

Although "[a] complaint does not. . .  need to 'spell out the details' of the trade secret to avoid dismissal," *Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *6 (quoting *Oakwood Lab'ys LLC*, 999 F.3d at 906), "information alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it." *Oakwood Lab'ys LLC*, 999 F.3d at 906.  Said another way, the plaintiff must articulate the trade secret "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."  *Id*. (quoting *Diodes, Inc. v. Franzen*, 67 Cal. Rptr. 19, 24  (Cal. Ct. App. 1968)) (finding that the plaintiff had alleged trade secrets with sufficient particularity where it "identified as trade secrets the variables that affect the development of its microsphere products, including the data, peptide-specific release profiles, and other discoveries associated with those variables, which it collected through 'extensive trial and error testing'" and "gave a very precise example by pointing to a particular document . . . that it had disclosed . . . under a confidentiality agreement, and it specified the contents of that document as containing trade secrets").

Here, Plaintiff does not sufficiently plead a claim for misappropriation of trade secrets under the DTSA, NJTSA, or New Jersey common law. Plaintiff's list of eleven alleged trade secrets, (*see* Am. Compl. ¶ 31), includes generic phrases that do not sufficiently "separate [the alleged trade secrets] from matters of general knowledge in the trade" such that Defendants could determine "the boundaries within which the secret lies," *see Oakwood Lab'ys LLC*, 999 F.3d at 906 (quoting *Diodes, Inc.*, 67 Cal. Rptr. at 24). To the contrary, Plaintiff has provided only vague descriptions of aspects of computer networking. For instance, as Defendants identify, Plaintiff alleges as one trade secret its "[n]on-standard port configurations and customer application messaging used in a unique network methodology for delivery at various platform levels." (Am. Compl. ¶ 31). But Plaintiff does not allege what, exactly, makes its "port configurations and customer application messaging" "non-standard." (*Id.*). Neither does Plaintiff allege what makes its "network methodology" "unique." (*Id.*). At bottom, the technologies Plaintiff references appear to be matters of general knowledge in the trade—only preceded by adjectives like "customized," "dynamic," "non-standard," and "proprietary." (*See* Am. Compl. ¶ 31); *see, e.g.*, *Greenstar Technicians, LLC v. Gouru*, No. 23-21293, 2025 WL 1311397, at *3 (D.N.J. May 5, 2025) (finding that plaintiffs had insufficiently pled the existence of a trade secret based on their '**revolutionary** Communications Protocol,' which 'enabled hardware-agnostic communication protocol'" (emphasis added)); *CLI Interactive, LLC v. Diamond Phil's, LLC*, No. 22-1602, 2023 WL 1818381, at *3–4 (D.N.J. Feb. 8, 2023) (holding that a plaintiff who alleged trade secrets including "**proprietary** optimization techniques and data" had "fall[en] short" because "'a list of general categories and types of information they allege comprise their trade secrets is not enough to identify the trade secrets at issue with the particularity necessary for Defendant to identify the information which Plaintiffs claim was misappropriated'" (quoting *Mallet & Co. Inc. v. Lacayo*,

16 F.4th 364, 384 n.24 (3d Cir. 2021)) (emphasis added)).  As a result, although the Court does not discount the possibility that "some information falling within [the] categories [Plaintiff articulates] may very well include trade secrets, there is a fair probability that many of the categories – and perhaps all of them – also include information that does not qualify for trade secret protection." *See Mallet & Co. Inc.*, 16 F.4th at 382.

Moreover, while "the Court recognizes the difficulty inherent in articulating what trade secrets Defendants may have misappropriated," *Greenstar Techs., LLC*, 2025 WL 1311397, at *3, because of the scant detail Plaintiff has provided, it is not clear to the Court what Plaintiff has actually developed or owns, or "whether what it developed is secret as opposed to matters of general knowledge," (Mov. Br. at 22).  Plaintiff certainly does not describe the technology underlying its alleged trade secrets.  (*See generally* Am. Compl.).  Nor does Plaintiff explain "how [it] developed that technology," other than to say that "the development of Eyesync was . . . difficult and . . . only achieved through many man hours of engineering."  (Am. Compl. ¶ 17); *see Voorhees*, 2023 WL 4636738, at *2 (dismissing a plaintiff's allegations as "wholly generic" where she alleged that she developed and owned "Augmented Reality for Education (AR4ED) software services," in part because plaintiff had "not provided enough detail" about the software—like "the technology underlying it or whether or how she developed that technology").

As *Greenstar* recognized, Plaintiff could have "attach[ed] documents describing [its] trade secrets or explaining in further detail what technology Plaintiff[] accuse[s] Defendants of taking." 2025 WL 1311397, at *3.  But Plaintiff did not provide **any** documentary evidence from which the Court could separate its alleged trade secrets "from matters of general knowledge in the trade." *Cf. Oakwood Lab'ys LLC*, 999 F.3d at 906–07 (vacating the district court's order granting defendant's motion to dismiss where the plaintiff "gave a very precise example" of the trade secret

at issue by "pointing to a particular document" it had disclosed under a confidentiality agreement and also "attached other documents specifying in detail secrets related to the Microsphere Project"). Plaintiff did not attach or reference documents it shared with Defendants under the agreement's terms, if any; nor did Plaintiff allege whether it provided Defendants any hard copies of materials in conjunction with the "demonstration" it conducted for Defendants in August of 2015.  (*See* Am. Compl. ¶ 26; *see also id.* ¶ 39 (alleging that Defendants used Signets trade secrets "disclosed to LG under the NDA in 2015[] . . . during discussions with and presentations from Signet")).[7]

Counts I II, and V of the Amended Complaint are therefore **DISMISSED** *without prejudice* to Plaintiff's ability to replead the trade secrets at issue with more specificity.  *See Phillips v. County of Allegheny,* 515 F.3d 224, 236 (3d Cir.2008) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile").

**B.    Plaintiff's Claims for Breach of the NDA and Breach of the Implied Covenant of Good Faith and Fair Dealing (Counts III & IV)**

Having dismissed without prejudice Plaintiff's claims in Counts I, II, and V, the Court next turns to Plaintiff's claims in Counts III & IV for breach of the NDA and breach of the implied covenant of good faith and fair dealing, respectively.

**i.    Plaintiff has Failed to Adequately Allege that Either Defendant Breached the NDA (Count III)**

At the outset, although Plaintiff alleged in its Amended Complaint that "Signet and Defendant LG Electronic MobileComm USA, Inc. [or, LGEMM] entered into the NDA on

---

[7]    Because the Court finds that Plaintiff has failed to plead the trade secrets at issue with sufficient specificity, it does not consider Defendants' remaining arguments in support of dismissal.  (*See* Mov Br. at 11–21 & 25–29); *see also Mallet & Co. Inc.*, 16 F.4th at 387 ("[W]ithout knowing what particular information [plaintiff] claims as trade secrets, we cannot assess its likelihood of success in establishing that the information the [d]efendants acquired, disclosed, or used is trade secret information or that misappropriation of a trade secret has occurred.").

September 3, 2015"—and did *not* allege that Defendant LGEUS is a party to the same—Plaintiff nevertheless often refers to both Defendants collectively as "LG" and does not differentiate clearly between the two with respect to its breach of contract claim.  (*See, e.g.*, Am. Compl. ¶ 71 (alleging that Plaintiff entered into the NDA with "Defendant LG Electronics MobileComm USA, Inc. [LGEMM]"); *id.* ¶ 74 (alleging that "LG breached the provisions of Sections 1, 5 and 11 of the NDA"); *id.* ¶ 75 (alleging that "LG Electronics MobileComm U.S.A, Inc. [LGEMM] . . . breached Section 1(d) of the NDA by not restricting the disclosure and use of Signet['s] confidential information to LG Electronics, U.S.A., Inc. [LGEUS] (or any other LG affiliate)"); *id*. ¶ 77 (alleging that "[a]s a result of LG's breaches of the NDA[,] Signet has suffered direct and consequential damages")).

Accordingly, in moving to dismiss Count III, Defendants argue that only Plaintiff and Defendant LGEMM—and *not* Defendant LGEUS—signed the NDA.  (Mov. Br. at 30–31).  In other words, Defendants maintain that LGEUS simply could not have breached the contract by developing and marketing its Pro:Centric Catena platform—or, for that matter, by engaging in any other behavior—because it was not a party to the NDA.  (*Id.*).

In opposition, Plaintiff continues to refer to both Defendants collectively as "LG" and does not address Defendants' contentions that only Defendant LGEMM could be held liable for breach of the NDA.  (*See generally* Opp. Br.).  Nevertheless, Plaintiff reasons that it sufficiently pled a claim for breach of the NDA based on its allegations that "the provision in Section 1 [of the NDA] prohibits the very conduct engaged in by **LG** here in using Signet's confidential information in the development and subsequent marketing and sale of the Catena system when the only permitted purpose of the use of that information was for evaluating the possibility of forming a business relationship or other commercial transaction."  (*Id.* at 27 (citing Am. Compl. ¶¶ 74–75 (emphasis

added))).  In addition, it urges that "*LG* violated Sections 1, 5, and 11 of the []NDA by using confidential information for purposes outside the scope of the agreement, including using the technology to develop its Pro:Centric Catena platform without a license." (*Id.* at 10 (emphasis added)).

Although Plaintiff has engaged in a confusing and persistent use of the label "LG," it nevertheless alleged (and the contract submitted by Plaintiff itself reflects) that only Defendant LGEMM was a party to the NDA at issue. (*See* Am. Compl. ¶ 71; *see also* Ex. A).  Despite Plaintiff's apparent insistence to the contrary, it is a "non-controversial principle that nonparties to contracts cannot be held responsible for a breach." *D.R. Horton Inc. - New Jersey v. Dynastar Dev., L.L.C.*, No. MER-L-1808-00, 2005 WL 1939778, at *17 (N.J. Super. Ct. Law Div. Aug. 10, 2005) (citing *FDIC Deposit Ins. Corp. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994)); *see also Preferred Real Est. Invs., LLC v. Lucent Techs., Inc.*, No. 07-5374, 2009 WL 1748954, at *3 (D.N.J. June 19, 2009) (citing *D.R. Horton Inc.*, 2005 WL 1939778, at *17 for the same proposition). Therefore, to the extent Plaintiff uses the phrase "LG" in its Amended Complaint and Opposition Brief to suggest that Defendant LGEUS breached Sections 1, 5, and 11 of the NDA by "making, using, and selling" the Pro:Centric Catena system, (*see* Am. Compl. ¶ 74), Count III is **DISMISSED** as to LGEUS *without prejudice*.

Remaining, then, is Plaintiff's allegation that Defendant LGEMM breached Section 1(d) of the NDA, (*see* Ex. A at 2–3), by disclosing confidential information to Defendant LGEUS, which then allegedly used that information to develop its Pro:Centric Catena platform. (*See* Am. Compl. ¶ 75).  As for this claim, Defendants contend that Plaintiff relies only on its "unsupported assertion that its product and [Defendant] LGEUS's . . . are 'the same'" and has failed to "allege specific conduct, of any kind, by any individual affiliated with LGEMM." (Mov. Br. at 30–31

17

(quoting Am. Compl. ¶ 39)).  Defendants maintain that Plaintiff's allegation that LGEMM "breached . . . the NDA by not restricting the disclosure and use of Signet confidential information to [LGEUS]," (Am. Compl. ¶ 75), is "conclusory" and "falls far short of specifically alleging a breach of any provision of the []NDA," (Mov. Br. at 29–30).  Meanwhile, Defendants assert that any of Plaintiff's "allegations as to breach of contract are virtually a duplication of their trade secret misappropriation claims."  (*Id.* at 29).  Defendants lastly argue that Plaintiff has failed to plead any damages resulting from the alleged breach of the NDA.  (*Id.* at 31).

Without differentiating between defendant LGEMM and defendant LGEUS, Plaintiff maintains that it sufficiently pled a claim for breach of the NDA because (i) Plaintiff and "LG" formed a contract; (ii) "LG[] . . . stated [an] intention" to license Plaintiff's technology; (iii) "LG" made "unpermitted use . . . of Signet's trade secrets in developing the Pro:Centric Catena system which is a replication of Signet's Eye[s]ync system;" and (iv) Defendants "release[d] and market[ed] the Catena system beginning in May 2021."  (Opp. Br. at 27 (citing Am. Compl. ¶¶ 28–33 & 37–42)).  Plaintiff further insists that it "specifically pled that it has incurred damages as a result of the breaches of *Section* 1 described in the [Amended Complaint]."  (Opp. Br. at 27 (citing Am. Compl. ¶ 77)).[8]

In reply, Defendants reiterate that Plaintiff did not address its "critique that Signet has failed to allege ***what conduct*** breached the []NDA and ***why*** . . . Signet merely assumes a breach, premised . . . entirely on a perceived similarity between Catena and its own internal product

---

[8]    Because the Court finds that Plaintiff has not adequately pled that LGEMM breached the NDA, it does not yet reach Defendants' argument that Plaintiff has failed to show damages, "as required to sustain its breach of contract claim."  *New Jersey Chinese Cmty. Ctr. v. McAleer*, No. 21-8320, 2025 WL 1564869, at *17 (D.N.J. June 3, 2025).

development." (Reply Br. at 14).

In New Jersey,[9] to state a claim for breach of contract, "a plaintiff must allege '(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.'" *On Location, Inc. v. Popovich*, No. 22-0893, 2023 WL 2674843, at *4 (D.N.J. Mar. 29, 2023) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)). To prevail on a motion to dismiss, a plaintiff must do more than "parrot the language" of the contract at issue, and must provide "non-conclusory factual allegations setting forth what actions [the defendant] allegedly took to violate [the] provisions" at issue. *StrikeForce Techs., Inc. v. WhiteSky, Inc.*, No. 13-1895, 2013 WL 3508835, at *7 (D.N.J. July 11, 2013). In *StrikeForce*, for instance, the court dismissed a breach of contract claim where plaintiff alleged that defendant had "disclosed to a third party . . . trade secrets and other confidential information" in violation of an agreement, but pled only that it believed the defendant "granted third parties access to [plaintiff's] technology, to reuse, copy, replicate, and/or reverse-engineer StrikeForce's Customized Software." *Id.* (citation modified).

This case is like *StrikeForce*. Aside from its plain statement that LGEMM "breached Section 1(d) of the NDA by not restricting the disclosure and use of Signet confidential information," (Am. Compl. ¶ 75), Plaintiff has put forth no factual allegations whatsoever to support the contention that Defendant LGEMM shared confidential information with Defendant LGEUS—a third-party to the contract—in violation of the NDA, (*see generally* Am. Compl.). As in *StrikeForce*, "notably missing from the [Amended Complaint] are non-conclusory factual

---

[9]      Although Defendants cite to one case analyzing New York contract law, (*see* Mov. Br. at 29 (citing *See Logical Design Sols., Inc. v. CVS Pharmacy, Inc.*, No. 20-12077, 2021 WL 926614, at *4 (D.N.J. Mar. 11, 2021))), neither party appears to dispute that New Jersey law applies to the contract at issue. (*See* Am. Compl. ¶ 80 (referring to the implied covenants "inherent in every contract in the State of New Jersey"); *see also* Mov. Br. at 29 ("Signet must do more to make out a viable contract claim under New Jersey law.")).

allegations setting forth what actions [LGEMM] took to violate" Section 1(d) of the NDA. *See StrikeForce Techs., Inc*, 2013 WL 3508835, at *7 ("StrikeForce's reliance on various contractual provisions limiting the use of its technology and dissemination of its *confidential information* does not, by itself, suffice to state a plausible claim of breach."). For that reason, Plaintiff's claims for breach of contract against Defendant LGEMM are also **DISMISSED** *without prejudice*, because "[t]he inadequate pleading as to this aspect of the breach of contract claim may, possibly, be cured through the addition of concrete factual allegations." *See id.*

### ii. Plaintiff has Failed to Allege a Breach of the Duty of Good Faith and Fair Dealing (Count IV)

Defendants next argue that this Court should dismiss Plaintiff's claims that they violated the implied duty of good faith and fair dealing. (Mov. Br. at 31–33). Defendants insist that Plaintiff's "allegations amount to the mere assumption that '[Defendants'] intentions were self-serving, contrived, dishonest, and only for personal monetary gain,'" (Mov. Br. at 32 (quoting Am. Compl. ¶ 83)), and so Plaintiff "alleges no fact from which the Court could infer that Defendants acted with the requisite bad faith and a specific purpose to harm Signet," (Mov. Br. at 33).

In opposition, Plaintiff maintains that it pled allegations "sufficient to support a reasonable inference of an improper motive or bad intentions." (Opp. Br. at 29). For instance, "Paragraph 24 of the [Amended Complaint] alleges the exceptionally difficult task for a third party to independently duplicate Signet's trade secret information." (*Id.* (citing Am. Compl. ¶ 24)). And "Paragraph 26 alleges that it was LG who first contacted Signet asking for a demonstration of EyeSync and were particularly pleased with the ability of EyeSync to achieve precise audio synchronization, a key requirement for the development of multicast transmission in networks such as EyeSync and Catena." (Opp. Br. at 29 (citing Am. Compl. ¶ 26)).

Defendants respond that Plaintiff's purported theory—that "'LG wished to lull Signet into

a false sense of security'"—does not "flow from what Signet has actually alleged." (Reply Br. at 14 (quoting Opp. Br. at 29)). For this reason, Defendants argue, this Court "'cannot draw the reasonable inference that Defendant[s] are liable for the misconduct alleged.'" (Reply Br. at 14–15 (quoting *D&D Tech., Inc. v. CytoCore, Inc.*, No. 14-4217, 2014 WL 4367314, at *3 (D.N.J. Sep. 2, 2014))).

Although "'[t]here is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing,'" courts have held that "'two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract.'" *Soltis v. Catalent Pharma Sols.*, No. 23-0567, 2023 WL 6990785, at *4 (D.N.J. Oct. 23, 2023) (quoting *Yapak, LLC v. Mass. Bay Ins. Co.*, No. 09-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009)). A plaintiff who alleges, in a conclusory fashion, that a defendant acted willfully, wantonly, or maliciously, cannot survive a motion to dismiss. *See Yapak, LLC*, 2009 WL 3366464, at *2.

The Court holds that Count IV cannot survive as pled. Plaintiff alleges, without supporting factual averments, that Defendants' "intentions were self-serving, contrived, dishonest, and only for personal monetary gain." (Am. Compl. ¶ 83). Without more, the Court finds that these conclusory allegations do not reflect a bad faith or malicious motive, as required for a claim for breach of the implied covenant of good faith and fair dealing. *See, e.g., Yapak, LLC*, 2009 WL 3366464, at *2. Moreover, because Plaintiff continues to refer to both "Defendants" and "LG" interchangeably, this claim also fails for the reasons discussed above (*see supra* Section B(i)). For those reasons, Count IV is likewise **DISMISSED** *without prejudice*.

**C.      Plaintiff's Claim for Unjust Enrichment (Count VI)**

Finally, Defendants argue that this Court should dismiss Plaintiff's unjust enrichment claim "as duplicative of [its] contract claims," because "Signet's allegations as to unjust enrichment are the same as those for breach of contract and breach of the implied duty, which are themselves duplicative of Signet's claims of trade secret misappropriation." (Mov. Br. at 33–34). Defendants further explain that "there are no allegations that Signet *expected* remuneration from both Defendants at the time Signet conferred any alleged benefit on them or that both Defendants failed to remunerate Signet in a way that enriched them beyond their contractual rights," and thus insist that "[t]he only allegations to this effect in the [Amended Complaint] are wholly conclusory and insufficient." (*Id*. at 34–35).

Plaintiff counters that an unjust enrichment claim should only be dismissed as duplicative of a breach of contract claim where "'the governing agreement is undisputed.'" (Opp. Br. at 30 (quoting *Ohm Sys., Inc. v. Senergene Sols., LLC*, No. 23-1340, 2023 WL 8437279, at *2–3 (D.N.J. Dec. 5, 2023)). That's not the case here, Plaintiff urges, because "LG has not yet filed and Answer and seeks to dismiss the Breach of Contract Count in the present Motion." (Opp. Br. at 30). Plaintiff further offers that it "adequately pleaded a claim for unjust enrichment by specifically alleging the benefits conferred upon LG by virtue of its disclosure of trade secret and confidential information to LG, the retention of those benefits without payment would be unjust, that Signet expected to be paid for the value of its disclosed technology and that the failure by LG to compensate Signet enriched LG beyond what the MNDA allowed." (Opp Br. at 30 (citing Am. Compl. ¶¶ 92–96)).

Defendants rebut that "[w]hile plaintiffs may, in certain circumstances, plead unjust

enrichment in the alternative to a contract claim, Signet has not done so – and the [Amended Complaint] asserts unjust enrichment as a free-standing theory of liability." (Reply Br. at 15 (emphasis omitted)). According to Defendants, "[t]his is inappropriate and alone warrants dismissal." (*Id.* at 15). Moreover, Defendants maintain that "Signet is also wrong that its unjust enrichment claim may not be dismissed as duplicative of its claims for breach because 'LG has not yet filed an Answer.'" (Reply Br. at 15 (quoting Opp. Br. at 30)). Defendants point to the fact that "[n]o answer had been filed in [*Ohm Systems, Inc.*]," which Plaintiff cites to, "and yet the court dismissed unjust enrichment as duplicative." (Reply Br. at 15 (citing *Ohm Sys., Inc.*, 2023 WL 8437279, at *2–3)). Instead, Defendants advance, "the test is whether 'there is a bona fide dispute [as to] whether a relevant contract exists,'" and "[n]o bona fide dispute has been raised here." (Reply Br. at 15 (citing *Ohm Sys., Inc.*, 2023 WL 8437279, at *3)).

New Jersey law allows a claim for unjust enrichment "where the plaintiff has, under false auspices, conferred a benefit on the defendant." *Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *14. To prevail, a Plaintiff must prove "(1) the 'defendant received a benefit' from the plaintiff; (2) 'retention of that benefit [by the defendant] without payment would be unjust'; (3) plaintiff 'expected remuneration from defendant at the time [they] performed or conferred a benefit on defendant'; and (4) the 'failure of remuneration enriched [the] defendant beyond its contractual rights.'" *Semeran v. Blackberry Corp.*, No. 15-0750, 2016 WL 406339, at *6 (D.N.J. Feb. 2, 2016) (quoting *VRG Corp. v. GKN Realty Co.*, 641 A.2d 519, 526 (N.J. 1994)). A plaintiff must further show that there "is a direct relationship between the plaintiff purchaser and the defendant or 'a mistake on the part of the person conferring the benefit.'" *Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *14 (quoting *Semeran*, 2016 WL 406339, at *6).

Although Federal Rule of Civil Procedure 8(d)(2) certainly allows alternative pleading,

"[a]n unjust enrichment claim is unavailable where it simply duplicates, or replaces, a conventional contract or tort claim." *Kuzian v. Electrolux Home Prods., Inc.*, 937 F. Supp. 2d 599, 618 (D.N.J. 2013).  In fact, "unjust enrichment may be pleaded in the alternative" only in instances "where there is a bona fide dispute whether a relevant contract exists or covers the dispute at issue." *Id.* For that reason, "courts in this [d]istrict regularly dismiss unjust enrichment claims that are duplicative of a complaint's breach of contract claims when the governing agreement is undisputed." *Gujja v. Inpatient Servs. of N.J., P.C.*, No. 21-19416, 2022 WL 2834998, at *2–3 (D.N.J. July 20, 2022).

Here, Plaintiff bases its claim on identical underlying conduct as its breach of contract claim.  Plaintiff stakes its breach of contract claim on the allegation that that "LG used and benefited from the ***confidential information disclosed to LG*** under the NDA in developing, marketing, offering to sell and selling its televisions and related devices and software using LG's Pro:Centric Catena [] platform," (Am. Compl. ¶ 73 (emphasis added)), and likewise attempts to make out an unjust enrichment claim based on the same allegation that Defendants engaged in "***disclosure of Signet's highly confidential and proprietary information*** to which they are not entitled through their unlawful and deliberate actions and misconduct," (Am. Compl. ¶ 93 (emphasis added)).  Furthermore, Defendants have not disputed the validity or enforceability of the NDA.  (*See generally* Mov. Br.; Reply Br.); *see Gujja v. Inpatient Servs. of N.J., P.C.*, No. 21-19416, 2022 WL 2834998, at *2–3 (D.N.J. July 20, 2022*) ("Although Gujja may plead claims in the alternative under Rule 8(d), absent a claim that the Agreement is invalid . . . the Court 'cannot sustain claims founded on quasi-contractual theories.'").  This remains true notwithstanding whether an answer has been filed. *See, e.g., Ohm Sys., Inc.*, 2023 WL 8437279, at *2; *Gujja*, 2022 WL 2834998, at *3 (dismissing a claim for unjust enrichment because "the governing agreement

is undisputed," even though defendant had not yet filed an answer); *SAT Agiyar, LLC v. 7-Eleven, Inc.*, No. 19-19994, 2020 WL 3546821, at *6 (D.N.J. June 30, 2020) (doing the same). For all these reasons, Plaintiff's unjust enrichment claim in Count VI is **DISMISSED** *without prejudice*.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss is **GRANTED**. Plaintiff's Amended Complaint is **DISMISSED** *without prejudice*. An appropriate Order follows.

**Dated: November 10, 2025**                              */s/ Esther Salas*
                                                                              **Esther Salas, U.S.D.J.**